The next case on calendar is United States v. Avenatti, 21-5225. Each side will have 15 minutes in this case. May it please the Court, this is Howard Sretnick, Zooming in from Miami, Florida. Can everyone hear me okay? Yes, welcome by Zoom. Thank you, Your Honor, and thank you for allowing me to appear by Zoom. If I could reserve four minutes for rebuttal. I'll try to help you, but watch your clock. Yes, Your Honor. So this is the interlocutory appeal of Michael Avenatti, whose first trial was terminated by mistrial after the District Court determined that the government had committed a Brady violation in failing to produce, indeed suppressing, favorable evidence that could have made a difference in Mr. Avenatti's then-ongoing trial. Counsel, is that right? Was there a Brady violation here? Doesn't Brady require that the prosecutor know about the existence of the potentially exculpatory evidence? And as I read the record, this was inadvertent. We didn't realize we were sitting on this information until the middle of the trial. The District Court found there was a Brady violation. I understand that. I'm questioning the legal determination that the District Court made, because I'm not sure I agree with that ruling. So I think we would start two years before the trial with the interview of the primary government witness, Judy Regnier. It's Government Exhibits 1084 and 1085. Those are two FBI 302 reports documenting that the prosecutor, the case prosecutor, an assistant prosecutor, and two federal agents were told by the witness, Regnier, of the existence of the data that was suppressed. Twice she told them about it. Twice it's documented in a federal report. And still the government took no steps, according to the government, to make that evidence available to Mr. Avenatti for two-plus years. Did Mr. Avenatti ever specifically request to have this data? My name, my trade name, there's nothing in the record. No, to my knowledge, looking at the record, I don't see the trade name tax. As I understand it, I haven't seen the list of search terms, but the searches, I assume, were sort of word searches in order to try and find documents that were responsive to the search warrant. I couldn't answer how the search warrant, the record is a bit ambiguous on that. Is that to make a terminal available to Mr. Avenatti at the IRS office so that he could actually conduct his own searches if he wanted to? A terminal was available, but even as late as August 24, the last day of the trial, the government agent himself said that accessing tabs in that terminal couldn't be done. There was password protection. There was other impediments for Mr. Avenatti. Oh, I see. Mr. Avenatti wouldn't know the technical details of his law firm's computer. Is that what you're saying? I certainly don't know my law firm, so I don't know that there's any basis to conclude that Mr. Avenatti, a trial lawyer, is going to know how to access accounting data at a law firm. But couldn't the receiver or somebody help with that obstacle? I guess the question is did he ever try, and it sounds to me like the answer is no. The answer is he requested all of the accounting data. No, that wasn't my question. My question was did he ever utilize the terminal at the IRS office to conduct his own search? I guess the answer is no because he didn't know how to do it because of these technical obstacles. Is that your answer? My understanding is he tried to get what he could see on the terminal. The terminal did not give complete access to the servers. The government had access to the servers directly. Mr. Avenatti requested to have the servers given to him. The government opposed. The judge refused to give Avenatti the servers themselves until actually after the trial. By September 16, two or three weeks after the trial, finally the government relented and turned over the servers to Mr. Avenatti. When you say turned over the servers, are you talking about just providing him with unrestricted access to the data that was imaged in some way from the servers? I'm not sure what you're saying. Correct. A mirror image of the servers was withheld from Mr. Avenatti until after the trial. And so can he now conduct his own searches in whatever fashion he wishes? Someone acting on his behalf can do that now. Do that now. Okay. So that gets back to my earlier question is that if Mr. Avenatti didn't ask for it, if he didn't try to get it himself, and the government for whatever reason didn't run a search of the tabs data, why would we say there was a brainy violation here if nobody realized that there was additional financial information there until the government's case in chief was almost completed? That's not the record, Your Honor. In fact, the government knew two years beforehand that the accounting records were compiled in two forms, QuickBooks and tabs, given the two FBI reports that I referenced earlier. What do we do with the fact that the information in tabs might be inculpatory as well as exculpatory? Because assuming it's inculpatory, I would think the government would have wanted to use it during their case in chief. I have two answers for you. First, the district judge found, and it's hard to believe anything to the contrary, that the tabs data is exculpatory because what it tracks is time spent by lawyers. It tracks expenses advanced by the lawyers. That could only increase the amount of money that Mr. Avenatti was entitled to. I didn't read the district court's orders to say that the court found they were exculpatory. I read the district court's order to say Mr. Avenatti needed additional time, which because of the volume of the data was going to take a substantial amount of time, in order to make a determination as to whether that information might be useful to the defense. So I would refer the court to the record excerpts ER-2911 and then the subsequent pages. Which excerpt are we talking about? We're talking about now the transcript of the hearing at which the district judge granted the mistrial. Okay. And he begins by referencing one page I have. What page are you on? I'm sorry. ER-2911. Page 56 of the transcript. Okay. Where the judge begins his findings as saying, first of all, financial data is critical to this case. And then goes on to explain that Regnier had told the government about the tabs data two years earlier in the two reports I referenced. That the government, on the next page the judge finds, the government was fully unnoticed of the significance of the tabs data. I believe the government, according to the judge, made no effort to secure the tabs data. It was in the government's actual possession, Your Honor. The government had actual notice of its existence. There was no issue about that. The government had four federal agents that were aware of the existence of tabs data. But the district court also made a factual determination that this was basically inadvertence. I'm referring now to ER-2917. It wasn't produced through inadvertence and a failure to appreciate what was there to support his finding that it was not willful. So if that's the case, I go back to my first question. How was Brady violated if nobody realized the significance of this data? Well, as Regnier told the government of the significance, the judge recognized the significance. His finding of inadvertence is not supported by an evidentiary hearing. And I would commend the court to Oregon v. Kennedy, the Supreme Court case, the landmark case on double jeopardy, where to make a finding of the government's intent, the court relied specifically on testimony, an evidentiary hearing to make that determination. Now Justice Alito, then the Deputy Solicitor General of the United States, arguing his amicus curiae for the United States, made the point that the finding of inadvertence or the finding of no intent was supported in that case by an evidentiary hearing. In this court, weren't there a number of hearings, both before trial and mid-trial, that the district court presided over, some of which were outside the presence of the jury? I guess all of them were outside the presence of the jury, at which testimony was adduced from both prosecutors and agents, both on the team and on the prosecution team. So what additional evidence would be needed if we were to remand and require the district court to revisit its inadvertence finding? So if the court is requiring a defendant to prove that it's the intention of the government to goad the defendant into a mistrial, then that turns on the credibility of those who goaded the mistrial. But there was testimony taken. My question for you is, what additional testimony? Because it seemed to me that the court inquired of these witnesses, essentially, how did you miss this? And then after holding those hearings, made the finding that we're looking at now. So the agents were under oath, and they did testify that no prosecutor asked the agents to go get the tab data. The prosecutors did not testify under oath. The prosecutors were not cross-examined. AUSA Sable, who was the president… But the judge saw the prosecutors argue against the mistrial. So why isn't that enough to say these prosecutors were not trying to get a mistrial? I believe the right of confrontation to cross-examine those who are claiming deliberate ignorance of the value of the evidence that was suppressed is essential to the determination. In two other cases in federal court, one in the Fifth Circuit, Martinez v. Caldwell, and one in the Eleventh Circuit, United States v. Fern, following the lead of Oregon v. Kennedy, the Supreme Court case, evidentiary hearings were held. In all three of those cases, fact-finding was done after the prosecutor, or in one case the judge himself, was examined by the defendant. I know of no case that supports the proposition that credibility findings can be made without giving the adverse party an opportunity to confront and cross-examine the prosecutor. So, I ask again, what would you proffer that an additional hearing on remand would induce? Number one, it would establish… Let me just… Let me direct the court's attention to E.R. 2691, E.R. 2692, where A.U.S.A. Sable makes a representation to the court with regard to tax. I don't even know where it even exists. Of course he knew it existed, because he was at the interviews with Judy Renier. He was in the courtroom when Judy Renier testified about it. Nothing was done for 23 days. The question is, why did the prosecution not produce that evidence? Why were no agents sent to go get that evidence? Why was Mr. Abinanti forced three or five weeks into his trial to finally get the truth out of the prosecutor, who by that point in time understood that the summary witness, the expert, had testified inaccurately to that jury? By then, the prosecutor knowed that his opening statement had mischaracterized the evidence. By then, the prosecutor knew that if this case went to the jury, with Abinanti having the evidence in hand where he could expose the suppression of the evidence, could expose the inaccuracy of the testimony of the government's case, undermining the integrity of the presentation, Abinanti had the momentum in his favor. Unfortunately, the government held the evidence… So is your theory that the prosecutors knew all along that they were proceeding into a trial that was going to need a mistrial, like from the start? Yes. You think from the start they did this all as a sham? What I know from the start is Abinanti warned the court 15 times that a mistrial would be needed if he didn't get all of the accounting records, all of the files. Egger never said the word tabs in any of those requests, right? To my knowledge, he never identified the software package by its trade name tabs. I agree with you, Your Honor. Nevertheless… How were the prosecutors supposed to realize if he didn't name what was missing, how were they supposed to find what was missing? Because Judy Renee told them two years earlier, twice. But it doesn't seem like he said, you know, if you asked my accountant, she would be able to tell you exactly where to look or something like that. There's nothing, there's like a disconnect of how he had presumably some notion of how his law firm worked and never pointed out where the gap was. So the government had access to Renee. Mr. Abinanti did not. Their relationship had ended upon his indictment. So he had no access to his office servers, no access to his office personnel. The government didn't. They were in actual possession of the server. They were in actual control of the witness. They had the information. They were on notice, and the district judge so found. And based on that, Your Honors, we submit that the government's failures to timely produce that evidence with repeated requests to produce all of it, even if the trade name of the software package is not mentioned by the defendant, that is sufficient to constitute coding. I see that I've well exceeded. I'll still give you some time for rebuttal. Judge Corman, did you have any questions? No. Okay. We'll give you some time for rebuttal still, but let's hear from the government. Mr. Abinanti. Good morning. May it please the Court. Alexander Robbins, appearing on behalf of the United States. The question before this Court on this interlocutory appeal is a narrow double jeopardy one. It's not only whether there was misconduct below. It's whether there was misconduct with the specific purpose of trying to end the trial before it could be submitted to the jury for a verdict. And putting the question that way, I think, makes the answer very clear. Even now, my colleague, in his briefing and just now before the Court, virtually at this podium, was not able to come out and say, with the possible exception of one answer to Your Honor's question, Judge Breeden's question, that the government here acted with the intent to keep this case from being submitted to the jury. And that's the legal test. Instead, the vast majority of the briefing is doing exactly what Oregon v. Kennedy said not to do, which is conflating the question of misconduct on one hand, which could be the basis for a Brady claim post-judgment, which could be the basis for a due process Bundy-style claim, with the separate, distinct question of whether the government tried to prevent this case from going to the jury. And that squarely, on this record, did not happen here, as the district judge understood it. So this Court can decide this case on the basis of the district court's factual finding that there was no misconduct. Or a fact of the record shows that the defendant repeatedly asked for mistrials on a variety of bases throughout this trial. Or simply on the failure of the defense here to make the claim that would be required under the Supreme Court's and this Court's precedent to get an interlocutory appeal under these circumstances. That's the government's case. Unless the Court has questions, we would ask that this Court. Well, I do have one. How is it that the filter team initially uncovered two TABS spreadsheets, which I think were included in, was it Exhibit 148? I believe so, yeah. And one other. But was not able to discover all of the remaining relevant TABS data. How was the search structured and performed? I would refer the Court to Volume 13 of the Excerpts of Record. There's a fairly lengthy discussion between the district judge and the head of the filter team about the process and sort of on the ground how it worked. My understanding of it is that the TABS data was password protected, so it was not researchable. It couldn't be searched. And so the search terms were generally focused on client names. Again, this is a whole law firm servers. There's lots of other people who are not involved in litigation, have their attorney-client and privacy interests at stake. And, of course, the government was not allowed to just browse through the database that it had. It was limited to the warrant and what it could search for. So the search terms for client names weren't pulling up the TABS data because the TABS data was password protected. And that was one of the issues that came up at trial. And one of the reasons there was some confusion as to what was even there was because when they were running search terms for the clients, they weren't getting the TABS data. Once I think the prosecution team, or I couldn't recall the team, I'm sorry, but the government contacted the vendor, was able to get the password, and then as soon as that happened, was able to access the TABS data and find the same data that was flagged in the search terms that were as attachments to email so that there was TABS data, as I think my colleague mentioned, that was produced in this case because they were email attachments. Not necessarily searching the TABS data, the raw data itself. They found the spreadsheets as attachments. They were email attachments, exactly. So they weren't TABS data as such. They weren't in, I guess, one of the data file format is they were just attachments to emails, and the emails were case-related. So the government was able to find them that way. And I think most fundamentally, it's important to remember here, and I don't think there's disagreement, although my colleague can correct me if he does disagree, every piece of evidence that the government found, it produced a defense. The issue here is the evidence that the government did not find. That's the TABS data that we're talking about. For this TABS data, I understand that you believe that it would not show that Mr. Abinanti was innocent of any of the charges. But would it show that he stole less? It seems pretty persuasive that if it was evidence of time spent and expenditures, that it would somewhat reduce the amounts that he might have stolen. No, Your Honor, for two different reasons. And I briefly refer, Your Honor, to our discussion of this in our brief. For two of the five victims, Fain and Tram, there was no TABS data at all. And for one of the victims, Gardner, the TABS data actually was helpful to the defendant. So even now we're narrowing the scope to two victims, but more fundamentally on the nature of the way this crime was conducted, it wouldn't help the defendant. Because this is not a case about inflated bills or overbilling or, you know, saying something was a business expense when it was a personal expense. That may have happened, but that was not the theory of the prosecution, was that Mr. Abinanti accounted for the money he was owed, took that money, like his contingency fee in one case, and then simply stole the rest. So the disconnect here is this is not a case where the TABS data would, you know, show inflated bills. The nature of the scheme, and we give an example in our brief, I believe, the third victim, whose name is escaping me, it's not Johnson or Gardner. There was an instance where the, I guess these were the two emails that, the attachments to the emails that were produced. He correctly accounted for what he was owed. He had his assistant, Judy Renier, account for that, took that money out of the client trust account for the TABS data, and then stole the rest. So then is it your position that the district court misunderstood what the TABS data was in the Brady ruling? It's our position that the district court's actual findings were correct, but that it's a Brady legal conclusion flowing from those actual findings was incorrect. Again, for the reasons that we have from the brief. That said, we are proposing that as merely an alternate basis for this court to affirm, affirm the judgment below or dispense the appeal. The more straightforward path here is not to deal with the Brady issue at all, because again, this is, we're not appealing first. And second, an interlocutory appeal, if you're not supposed to be able to have an interlocutory appeal on a Brady issue. Criminal defendants are very limited when it comes to interlocutory appeals for good reason, so that people aren't able to delay their trials simply by filing an interlocutory appeal at Cites Abney and then running the clock out for six months or a year, while this court has to get involved and take the case from the district court and decide it. The most straightforward path to an affirmance or a dismissal here is that this double jeopardy claim is not culpable, frankly. The double jeopardy claim, the legal argument behind the defendant's double jeopardy claim is the very legal argument rejected in Morgan v. Kennedy that conflates misconduct on one hand, even intentional misconduct, with an intent to keep the case from going to court. So you have to figure out whether it's culpable. If we agree with you that it's not winning, is there really any point of calling it a dismissal instead of calling it a failure on the merits? I don't really see why it matters to you, why we'd call it a dismissal. I think at this point it certainly probably does not matter. We believe it's non-culpable. That's why we wouldn't dismiss the appeal immediately. But you're right, at this point, Your Honor, affirming the district court's order would have exactly the same effect. But in all events, we argue and we think that it's clear from the nature of the double jeopardy argument being brought before this court that this is a delaying tactic and that this court should send this case back to the district court so that Mr. Avenatti can have a trial and have the jury decide this case on the facts in front of it. Your Honor, have the two sides been able to use this TABS data in the meantime such that if Mr. Avenatti does not win and there is another trial, it'll be ready to go? Or do we still have to now have more discovery about the TABS data? Like, what's the status of the proceeding? I believe that the TABS data issue is taken care of. There's been a lot of activity in the district court. The district court docket kept going on this after the appeal was taken. The judge thought that he couldn't do anything substantive while he appeals pending but has been overseeing the process of everyone getting access to the TABS data, and there should be no reason that any further delay is necessary. Again, the district judge, with Mr. Avenatti's consent, set a trial date for November in this case, and that trial date, everyone understood, was going to go until a month after this issue surfaced in the district court. Mr. Avenatti, for the first time, claimed that there was a double jeopardy bar for re-prosecuting him. So at this point, we don't have a new trial date because the district court is waiting for us to decide the interlock? That is correct. There was a November trial date, which the district court then vacated after Mr. Avenatti took his appeal. Okay. That's all I know. So unless the court has further questions, we would ask this case be sent back to the district court once someone's found that I can have a trial, and the jury can then report it. Thank you. Thank you. Let's get three minutes to go. Thank you, Your Honor. Judge Talmadge, you had asked about Exhibits 48 and 174, and I think those really do highlight that the government had to have actual knowledge of the existence of the TABS data. I've looked at that, Counselor. I've looked at that. The problem is that you can't tell from looking at the attachment what the source of the data is. It's just a spreadsheet of dollars and descriptions, but it doesn't tell me that it comes from TABS. It could have come from QuickBooks. It could have come from some other spreadsheet-type application. If it was discovered as an attachment to an email, I'm not sure that answers the question. About the inadvertence and not realizing that there was more data available under TABS. So two answers. One, it didn't come from QuickBooks because the government had the source data for the QuickBooks, so they could quickly determine that. And Rene told them that the other source of data is TABS, so the combination of those two facts proves conclusively that attachments were not from QuickBooks. They were from TABS, and there's no dispute about that on the record. I'm not sure I'm willing to make that inferential evidentiary leap based on looking at the evidence. There was no dispute in the lower court that it's TABS data. And then in response to the government's suggestion that it's Avenatti trying to run out the clock, we need to remember the government is the one that suppressed the evidence, not Avenatti. Avenatti's been asking for all of the accounting evidence since the beginning of the case. So the suggestion that it's Avenatti who's trying to run out the clock overlooks the government's delay in making it available. The evidence was held hostage even through the trial. Even during the course of the trial, after Rene testified. The evidence was held hostage. It seems to me if I'm going to hold somebody hostage, I have to know that they're being held hostage. And the problem I'm having with your argument is the district court's factual finding that this was mere inadvertence on the part of the government, a failure to appreciate the fact that there was more gold there to be mined, potentially. My best response to that is you have to have an evidentiary hearing. When you have this many times that Avenatti complains and he doesn't have the full universe of all the evidence, when the government has exclusive access to Judith Rimier, when the government is offering evidence like those draft statements, when the government has, what, 15 days of trial testimony, and then it held hearings outside the presence of the jury at which sworn testimony was taken, I'm really having a hard time understanding what another evidentiary hearing is going to produce that we don't already know. Well, just like in Oregon versus Kennedy and the other two circuit cases, it's the intent of the prosecutors, not the failures of the agents. That's at issue here. The agents hope we have a very wholesome, a fulsome evidentiary record that underlies the district court's factual finding. So what more do we need? It sounds like you and I don't agree on the central point that an evidentiary hearing requires sworn testimony where the prosecutor swears to tell the jury that there was sworn testimony at the trial and in these hearings. The only sworn testimony are the agents admitting that no prosecutor directed the agents to go get the tax data. Okay. That's the sworn testimony. And that's the data we're talking about. I assume you and I are reading the record a little differently because I think, based on what I see here, that there's an awful lot of evidence in the record to support the district court's factual finding. I'm not saying it's clearly erroneous based on what I'm looking at. I respectfully ask that the court look at Oregon v. Kennedy. And what I did have is Justice Alito's argument before the Supreme Court, as Amicus Curia actually listened to it, where he pointed out that it was the testimony of the prosecutor that made the case for the government, not other collateral testimony because it's the intent of the prosecutor that matters for double jeopardy purposes. But if the prosecutor was really desiring a mistrial, then why did they so vigorously oppose it? They opposed it because they can't ask for a mistrial, otherwise that definitely triggers double jeopardy. They could not ask for the mistrial. They had to oppose it. You're saying that their vigorous advocacy was simply a sham to protect what they really wanted all along, which was to keep this case from going to a jury. That just doesn't make any sense to me. Once the Brady violation occurred, once Avenatti proved to the district court that the evidence had been suppressed, yes, the government wanted the mistrial. The last thing the government wanted was the jury. But you said in response to my earlier question that the sham was before the trial even began, that they started the whole trial with this sham intent of having a sham trial. So how does that line up with what you just said about during trial, then their motives changed? The government wanted that jury to decide the case without the expulsory evidence. Once the suppression was exposed, everything changed. At that point, the government doesn't want that jury. Finding the facts in this case with Avenatti having the evidence in hand. So your response earlier that they had an intent to go forward with a sham trial all along that would end in a mistrial, that's not what you meant. You meant they tried to go forward with a trial with partial evidence. Exactly. That's exactly right, Judge. They wanted Avenatti to be crippled during the trial. But once the crippling was exposed, then they had to shift gears. I commend the court's attention to the Sterling case, Judge Merriday's opinion. I realize it's only a district court opinion. But there he points out that where there is acts that suggest, I use the word deception in a broad way, where the truth is not being told to the court and the defendant is then forced to ask for the mistrial. In this case, Avenatti, all he asked for from the beginning, give him a complete set of the records. They were in the exclusive possession of the government. Once that momentum shifted, once the government knew that Avenatti proved to the court that that evidence existed and it had been kept from that jury, Avenatti was deprived of the ability to take that evidence to his jury. He should not be forced to see a second jury. Thank you, Your Honors. Thank you both sides for the helpful arguments. This case is submitted.
judges: TALLMAN, FRIEDLAND, Korman